

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



-------------------------------------------------------------------x

STATES OF NEW YORK, CONNECTICUT, DELAWARE,
ILLINOIS, MAINE, MICHIGAN, MINNESOTA, MISSOURI,
WASHINGTON, and the GOVERNMENT OF THE
PROVINCE OF MANITOBA, CANADA,

                            Plaintiffs,

      v.

UNITED STATES ENVIRONMENTAL PROTECTION
AGENCY and STEPHEN L. JOHNSON, in his official
capacity as ADMINISTRATOR OF THE UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY,

                           Defendants.

**COMPLAINT**

-------------------------------------------------------------------x

      Plaintiffs States of New York, Connecticut, Delaware, Illinois, Maine, Michigan,

Minnesota, Missouri, and Washington, and the Government of the Province of Manitoba, Canada

(collectively, "Plaintiffs"), each represented by its respective Attorney General or counsel, allege

as follows:

### NATURE OF THE ACTION

    1.    Plaintiffs bring this action for declaratory and injunctive relief against defendants

United States Environmental Protection Agency and its Administrator (collectively, "EPA") to

challenge EPA's illegal promulgation of the "National Pollutant Discharge Elimination System

(NPDES) Water Transfers Rule" (hereinafter, "Water Transfers Rule" or "the Rule"), codified at

40 C.F.R. § 122.3(i).

    2.    The Water Transfers Rule violates the federal Clean Water Act, 33 U.S.C. § 1251

*et seq.*, by exempting "water transfers" from the Act's National Pollutant Discharge Elimination

System ("NPDES") permit requirements.  NPDES permits limit the amounts and concentrations

of pollutants in discharges into the Nation's waters, and function as the primary mechanism for

achieving the Clean Water Act's purpose "to restore and maintain the chemical, physical, and

biological integrity of the Nation's waters . . . [by ensuring that] the discharge of pollutants into

the navigable waters [is] eliminated." 33 U.S.C. § 1251(a)(1).

3.       By exempting water transfers from NPDES permitting, the Rule violates express

provisions of the Clean Water Act while also undermining the Act's broad purpose of reducing

and eliminating water pollution.

### JURISDICTION AND VENUE

4.       This action arises under, and alleges violations of, the Clean Water Act and the

Administrative Procedure Act, 5 U.S.C. §§ 551-706 ("APA"). EPA's promulgation of the Rule

exceeds the Agency's statutory jurisdiction, authority, and limitations under 5 U.S.C. §

706(2)(C), and is arbitrary, capricious, an abuse of discretion and otherwise not in accordance

with law under 5 U.S.C. § 706(2)(A).

5.       The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331,

which raises a federal question, and seeks declaratory and injunctive relief under 28 U.S.C. §§

2201, and 2202, and under 5 U.S.C. § 701 *et seq,* which provides for judicial review under the

APA.

6.       While this Court has jurisdiction over the subject matter of this action as alleged

in paragraphs 4 and 5 above, Defendant EPA routinely claims that circuit courts of appeal have

exclusive jurisdiction over challenges to Clean Water Act rules promulgated by EPA, pursuant to

33 U.S.C. § 1369(b)(1). In promulgating the Water Transfers Rule, EPA made such a claim

concerning that Rule. 73 Fed. Reg. 33697 (June 13, 2008). To protect Plaintiffs' rights in the

event that EPA's jurisdictional claim is sustained, Plaintiffs are also filing a petition for review challenging the Rule in the United States Circuit Court of Appeals for the Second Circuit.

7.      Venue is proper within this federal district, pursuant to 28 U.S.C. §§ 1391(b) and (e) because Plaintiff State of New York and Defendants reside within the district.

## THE PARTIES

8.      Plaintiff States of New York, Connecticut, Delaware, Illinois, Maine, Michigan, Minnesota, Missouri, and Washington ("Plaintiff States") are sovereign states of the United States of America.  Each Plaintiff State brings this action *parens patriae* on behalf of its citizens and residents to protect public health, safety, welfare, and the environment, and also within its proprietary capacity.

9.      Plaintiff Government of the Province of Manitoba ("Plaintiff Manitoba" or "Manitoba") is a governmental entity in Canada and has a vital interest in preserving the natural resources found within its borders and protecting the health, safety, welfare, and enjoyment of all its citizens.  Manitoba brings this action to protect the aquatic resources within its boundaries which are owned and managed by it in accordance with its constitutional and statutory authority.

10.      Defendant United States Environmental Protection Agency is the federal agency with primary responsibility for implementing the Clean Water Act.

11.      Defendant Stephen L. Johnson is the Administrator of the United States Environmental Protection Agency.

12.      Defendant Johnson signed the Rule on June 9, 2008, and Defendants caused the Rule to be published in the Federal Register on June 13, 2008.

## STATUTORY AND REGULATORY FRAMEWORK

### The Clean Water Act

13.     The purpose of the Clean Water Act "is to restore and maintain the chemical,

physical, and biological integrity of the Nation's waters . . . [by ensuring that] the discharge of

pollutants into the navigable waters [is] eliminated." 33 U.S.C. § 1251(a)(1).

14.     The "primary means" for achieving this goal is the National Pollutant Discharge

Elimination System (NPDES), a permitting program administered by EPA and the States under

Section 402 of the Act.   Arkansas v. Oklahoma, 503 U.S. 91, 101 (1992); 33 U.S.C. § 1342.

NPDES permits contain conditions called "effluent limitations" and other provisions which limit

the amounts and concentrations of pollutants that may be discharged into waterways.  The Clean

Water Act generally prohibits the "discharge of any pollutant" from a "point source" into

"navigable waters" of the United States except when such a discharge is in compliance with a

NPDES permit. 33 U.S.C. §§ 1311(a), 1342.

15.     The phrase "discharge of a pollutant" under the Clean Water Act includes "any

addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12)

(emphasis added).

16.     Under the Act, "navigable waters" means the waters of the United States,

including the territorial seas. 33 U.S.C. § 1362(7).

17.     The term "point source" means "any discernible, confined, and discrete

conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit . . . from which

pollutants are or may be discharged." 33 U.S.C. § 1362(14).

4

18.     The Act defines "pollutants" broadly to include "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6).

19.     To further its goal of eliminating pollutants from the Nation's waters, Congress provided in the Clean Water Act only a few narrowly circumscribed exemptions to the NPDES permit requirements: The Act states that the "Administrator [of EPA] shall not require a [NPDES] permit" for (i) discharges composed entirely of return flows from irrigated agriculture or (ii) for certain discharges of stormwater runoff from mining operations or oil and gas activities. 33 U.S.C §§ 1342(l)(1), (2). The Act also exempts agricultural stormwater discharges and return flows for irrigated agriculture from NPDES permitting because Congress specifically excluded these from the definition of "point source." 33 U.S.C. § 1362(14). Similarly, Congress exempted only two categories of substances from its broad definition of "pollutants": certain sewage discharges associated with military vessels and certain materials injected into wells to facilitate the production of oil, gas, or water. 33 U.S.C. § 1362(6). Because discharges into the Nation's waters from these categories are excluded from the definition of "pollutant," they do not require NPDES permits.

20.     No provision in the Clean Water Act exempts "water transfers" from the NPDES permit requirements concerning discharges of pollutants into the Nation's waters from point sources.

21.. No provision in the Clean Water Act grants EPA rulemaking authority to establish additional exemptions to the NPDES permitting requirement; the only exemptions are those expressly created by Congress.

## STATEMENT OF FACTS

### EPA's Regulatory Exemption of Water Transfers from NPDES Permitting

22. On August 5, 2005, EPA issued an interpretive memorandum entitled "Agency Interpretation on Application of Section 402 of the Clean Water Act to Water Transfers" (hereinafter "Interpretive Memorandum"). That agency interpretation concluded that the movement of pollutants from one navigable water into another by a water transfer did not constitute an "addition" of a pollutant to the receiving water and therefore did not need a NPDES permit.

23. In Catskill Mountains Chapter of Trout Unlimited v. City of New York, 451 F.3d 77 (2nd Cir. 2006) ("Catskill II"), the Second Circuit specifically addressed and rejected EPA's Interpretative Memorandum and held that the plain language of the Clean Water Act established that pollutant discharges in water transfers required NPDES permits. Id., 451 F.3d at 84. In doing so, the Second Circuit reaffirmed its previous holding in that case. Catskill Mountains Chapter of Trout Unlimited v. City of New York, 273 F.3d 481, 494 (2d. Cir. 2001) ("Catskill I"). In the Catskill case, an organization of trout fishermen and several conservation and environmental organizations sued the City of New York for violating the Clean Water Act by discharging highly turbid water from the Schoharie Reservoir into the Esopus Creek without a NPDES permit, thereby impairing fishing and other recreational activities on the creek.

6

Catskill II, 451 F.3d at 79-80.  The Court held initially in Catskill I, and later in Catskill II, that, based on the "plain meaning" of the Act, in the absence of a NPDES permit, the transfer of polluted water from the reservoir to the creek through the Shandaken tunnel constituted the "addition" of pollutants into navigable waters from a point source (the tunnel) in violation of the Clean Water Act.  Catskill I, 273 F.3d at 489-94; Catskill II, 451 F.3d at 82-87.

24.    On June 7, 2006, six days before the Second Circuit's decision rejecting EPA's position in Catskill II, EPA published, and solicited public comments for, its proposed "National Pollutant Discharge Elimination System (NPDES) Water Transfers Proposed Rule," to exempt water transfers from NPDES permitting.  71 Fed. Reg. 32887 (June 7, 2006).  EPA stated that its "proposed rule is based on the legal analysis contained in the interpretative memorandum," which the Second Circuit would soon reject in Catskill II.  71 Fed. Reg. at 32889.

25.    On August 7, 2006, Plaintiffs New York, Connecticut, Delaware, Illinois, Maine, Minnesota, Missouri, and Manitoba filed detailed comments with EPA opposing the proposed Water Transfers Rule ("State Comments").  The State Comments pointed out that the proposed rule was contrary to the plain language of the Clean Water Act (as held by the Second Circuit in Catskill I and Catskill II) and contrary to Congress's stated intent in enacting the statute.  The comments further pointed out that the proposed rule did not address the impacts of allowing unregulated transfers of polluted water into clean water, including introduction of chemicals, turbidity, invasive species, and alteration of habitat by altering salinity and temperature of water, and that permitting the discharges was administratively feasible.  The comments also noted that the proposed rule was inconsistent with the EPA's obligations under Executive Order 13112, entitled "Invasive Species," 64 Fed. Reg. 6183, 6184 (February 8, 1999) (the "Executive Order"),

which requires, among other things, that each federal agency take "all feasible and prudent measures to minimize the risk of harm" and "not authorize, fund or carry out actions that it believes are likely to cause or promote the introduction or spread of invasive species." Id. at 6184.

26.     On June 9, 2008, Administrator Johnson signed the Water Transfers Rule and EPA caused it to be published in the Federal Register on June 13, 2008. The Rule categorically exempts from all NPDES permitting requirements "discharges from a water transfer," a phrase defined by EPA as "an activity that conveys waters of the United States to another water of the United States without subjecting the water to intervening industrial, municipal, or commercial use." 73 Fed. Reg. at 33699; 40 C.F.R. § 122.3(i). In issuing the Rule, EPA not only failed to failed to heed the State Comments including the admonition that EPA needed to take its obligations under the Executive Order into account, but it also disregarded the two Second Circuit decisions in the Catskill case and a district court decision in Friends of the Everglades v. South Florida Water Management District, 2006 U.S. Dist. Lexis 89450 (S.D. Fla. Dec. 11, 2006) ("Friends of the Everglades"), appeal pending, No. 07-13829 (11th Cir.), all holding that the Act clearly and unambiguously requires NPDES permits for pollutants discharged in water transfers. In doing so, EPA violated the fundamental principle that a court precedent declaring a statute clear or unambiguous bars an administrative agency from subsequently reaching a contrary construction of the statute. See National Cable and Telecommunications Assn. v. Brand X Internet Services, 545 U.S. 967, 982, 984 (2005).

8

**The Water Transfer Rule's Harm to Plaintiff States**

27.     By authorizing discharges of pollutants into the Nation's waters in "water transfers," the Rule poses injury to the waters, procedural rights, and proprietary and economic interests of Plaintiff States and Plaintiff Manitoba.

28.     In promulgating the Water Transfers Rule, EPA failed to heed the State Comments and the comments of others who pointed out that the rule would violate the Clean Water Act and risk harm to the environment and human health.  Under the Rule, EPA would now allow "water transfers" to contaminate the Nation's waters unregulated by a NPDES permit, allowing very polluted water to be directly discharged into very pure water.   Under the Rule, without the need for a NPDES permit, dischargers can transfer salt water into fresh water, send sediment-laden water into clear drinking water reservoirs and warm water into cold water habitats (such as trout streams), dump chemical-laden waters into waters employed in farm and ranch irrigation, and discharge waters containing invasive species into waters not yet infested.

29.     EPA acknowledges that there are thousands of water transfers in the United States, including transfers which supply water to some of the largest urban centers in the country, including New York City.  The adverse environmental impacts of unregulated water transfers are well established in the scientific literature.  Water transfers often introduce pollutants to the receiving water body that have significant impacts on the environment, including:  chemical pollutants, excessive  nutrients (nitrogen and phosphorus); increased sedimentation and alteration of basic water parameters, such as temperature and salinity; the introduction of invasive species and the resulting detrimental effects on native species.  Interbasin pollutant transfers also often carry significant public health threats including: contamination of drinking water supplies by

toxic by-products from the interaction of chlorine used in treatment processes with transferred total organic carbons, dissolved solids, nutrients, and algae; addition of harmful biota and cyanobacteria that produce toxins harmful to humans and wildlife; and addition of toxic biological and chemical effluents already present in the transferred water from earlier pollutant discharges.

30. The impact of water transfers, unregulated by NPDES permits, in polluting receiving waters has been established in several court cases. See, e.g., Dubois v. United States Department of Agriculture, 102 F.3d 1273, 1277-78, 1299 (1st Cir. 1996) (transfer of polluted water, including the parasite Giardia lamblia, from a river into a pond that serves as a "major source of drinking water" which is "unusual for its relatively pristine nature"); Catskill Mountains Chapter of Trout Unlimited v. City of New York, 244 F.Supp.2d 41, 46-7 (N.D.N.Y. 2003) (discharge in water transfer to Esopus Creek "is frequently visibly more turbid and higher in suspended solids than the receiving water," impairing trout fishing); Miccosukee Tribe v. South Florida Water Management District, 1999 U.S.Dist. LEXIS 23306 (S.D. Fla. 1999) (water transfer adds pollutants to Florida Everglades already suffering from "an imbalance in flora and fauna" because of phosphorus pollution), aff'd, 280 F.3d 1364 (11th Cir. 2002), rev'd and remanded on other grounds, South Florida Water Management District v. Miccosukee Tribe of Indians, 541 U.S. 95 (2004); and Friends of the Everglades, 2006 U.S. Dist. Lexis 89450 (S.D. Fla. Dec. 11, 2006) (discharge from canals to Lake Okeechobee transfers water of a different quality classification with biological differences and a visible plume).

31. The Water Transfers Rule harms Plaintiffs by impairing their waters and impairing their ability to take actions to protect such waters from pollutants discharged outside

their borders. For example, the navigable waters of the United States located within New York include various bodies of water, such as two of the Great Lakes, the Long Island Sound, Lake Champlain, the St. Lawrence River, and the Hudson River, all of which receive water from upstream out-of-state sources. The Great Lakes hold twenty percent of the world's freshwater and receive flow from 7 states other than New York. Great Lakes water enters New York in Lake Erie, flows into the Niagara River, over Niagara Falls, into Lake Ontario, and then empties into the St. Lawrence River. Water quality in Lake Erie is impaired due to excessive loadings of sediment and nutrients, and the Lake also suffers from discharges of invasive species and other pollutants. The Cuyahoga River in Ohio feeds Lake Erie and is itself impaired due to pollution from nutrients and sediments, heavy metals, and bacterial contamination. Discharges of pollutants to that River, including discharges from water transfers through the Ohio & Erie Canal, contribute pollutant loadings to Lake Erie. Consistent with the Water Transfers Rule, EPA does not require that these discharges be subject to NPDES permitting requirements, exacerbating these pollution impacts.

32. EPA and the courts have already determined that the Long Island Sound in New York and Connecticut is impaired and fails to meet water quality standards, in part due to discharges of the pollutant nitrogen occurring upstream of these states. See NRDC v. EPA, 437 F. Supp. 2d 1137, 1151-52 (C.D. Cal. 2006), aff'd, 2008 U.S. App. LEXIS 19755, *35-*36 (9th Cir. September 18, 2008). Nitrogen discharges result in lower levels of dissolved oxygen in the Sound, causing significant adverse ecological effects in its bottom waters. In affected areas, some organisms die off, while others are able to migrate away before succumbing to the lack of oxygen, leaving the affected areas barren and devoid of fin fish and invertebrate life. Because of

11

the nitrogen pollution in the Sound, heightened regulatory requirements called "Total Maximum Daily Loads" ("TMDLS") have been established under the Clean Water Act, 33 U.S.C. §§ 1313(d), (e), to remedy the problem.  The Connecticut River is the largest drainage basin within the Long Island Sound and a major source of the nitrogen pollution. The River flows for over 400 miles through New Hampshire, Vermont, Massachusetts and Connecticut before emptying into the Sound.  Discharges in water transfers within the Connecticut River basin occurring upstream of New York and Connecticut contribute to excessive nitrogen concentrations and resulting water quality problems in the Long Island Sound.  Consistent with the Water Transfers Rule, EPA does not subject such discharges to NPDES permitting requirements.

33.     Water transfers also result in the pollution of waters in Minnesota and Manitoba. Pollution from Devils Lake in North Dakota is now discharged by a new man-made conduit to the Sheyenne River which then feeds the Red River that forms the border between North Dakota and Minnesota.  The Red River then flows north and empties into Lake Winnipeg, in Canada, which is the world's tenth largest freshwater lake.  The Devils Lake discharges contaminate those downstream waters with sulfates, metals, nutrients, total dissolved solids and invasive biota, thereby threatening degradation of such waters.  Moreover, additional water transfers have been proposed as part of the Red River Valley Water Supply Project in North Dakota.  That project would transfer water from Lake Sakakawea in North Dakota to the Sheyenne and Red Rivers, further contaminating those receiving waters with nutrients and other pollutants, including invasive species such as the Asian clam, New Zealand mudsnail, spiny water flea, zebra mussels, cyanobacteria, microorganisms, and other disease agents should the treatment system fail.

Consistent with the Water Transfers Rule, EPA does not require that these water transfers be subject to NPDES permitting requirements.

34.     The navigable waters of Washington include many interstate waters, including the Snake River and the Spokane River. The Spokane River is water quality impaired due in part to pollutant discharges in Idaho. As a result, Washington is currently working on establishing TMDLs to remedy the impairment of the Spokane River.

35.     The Clean Water Act and its implementing regulations provide States procedural rights to protect their waters from out-of-state pollutant discharges. Under the Act, when a prospective pollutant discharger applies for a NPDES permit to discharge in a state authorized by EPA to issue NPDES permits, other states that would be affected by such discharges must be given an opportunity to make recommendations to the permitting state concerning the permit application. 33 U.S.C. §§ 1342(b)(3), (5); 40 C.F.R. §§ 123.25(a)(29), 124.10. If the permitting state does not accept the recommendations of an affected state, it must notify that state and the EPA in writing "of its failure to so accept such recommendations together with its reasons for so doing." Id. If EPA is dissatisfied with the permitting state's failure to protect the waters of an affected state, EPA can veto issuance of the NPDES permit and thereby prevent the proposed discharge of pollutants. 33 U.S.C. § 1342(d)(2).

36.     The Act also affords procedural rights where the discharge occurs in states where EPA issues NPDES permits. In those states, EPA must give affected states the same opportunity to comment on a NPDES permit application. 33 U.S.C. § 1342(a)(3); 40 C.F.R. § 124.10. This enables affected governmental entities, such as downstream states which receive water by

13

interstate flow and other affected states, to seek denial of a permit application or the imposition

of conditions in the permit to protect their waters.  Under the Act, Plaintiff Manitoba also

possesses procedural rights to comment on a proposed NPDES permit.  See 40 C.F.R. §§

123.25(a)(29), 124.10.

37.     The procedural rights of affected states to take administrative action to protect

their waters from out-of-state pollution is especially important to Plaintiff States because the Act

requires states to promulgate TMDLs on pollutant discharges to waters within their borders that

fail to meet water quality standards, even if out-of-state pollution is a significant cause of that

failure.  See 33 U.S.C. § 1313(d), (e).

38.     By exempting pollutant discharges in "water transfers" from NPDES permitting,

Plaintiff government entities affected by such discharges and which are responsible for the

quality of their waters are deprived of their procedural rights under the Clean Water Act to

oppose such discharges and/or to recommend permit conditions to lessen their adverse impacts to

their waters.

39.     For instance, the Water Transfers Rule has injured Minnesota and Manitoba by

taking away their procedural rights under the Clean Water Act to comment on Devils Lake

NPDES permitting.  In the past, Manitoba and Minnesota have fully participated in NPDES

permit proceedings for the Devils Lake water transfer, submitting extensive critiques of the

project.  Because of EPA's issuance of the Water Transfers Rule, however, the permitting state

has now indicated that in the future the Devils Lake discharge will be regulated under a

memorandum of agreement with the pollutant discharger without ensuring any opportunity for

14

Minnesota and Manitoba to comment on and oppose administratively the discharger's authorization to discharge pollutants.

40.     By exempting water transfers from NPDES permitting, the Rule also harms Plaintiffs' pecuniary interests by imposing additional administrative burdens on the water pollution programs which they administer within their borders.

41.     Under the Clean Water Act, NPDES permits generally must include "effluent limitations," which are permit conditions derived from uniform nationwide technology-based requirements to be established by EPA for removing pollutants from discharges into the Nation's waters. See 33 U.S.C. § 1314(b); Senate Consideration of the Conference Report, Oct. 4, 1972, reprinted in 1 Environmental Policy Division of the Congressional Reference Service, A Legislative History of the Water Pollution Control Act Amendments of 1972, p. 172. Because EPA deems water transfers to be exempt from NPDES permitting, it has not developed (and will not develop) the technology-based requirements for such transfers because there are no NPDES permits into which such requirements could be incorporated to reduce pollutant discharges.

42.     As a result of the Rule, Plaintiff States that want to protect their waters from polluted transfers within their borders have to bear the administrative burden of developing such technology-based requirements. For example, EPA has authorized New York's Department of Environmental Conservation ("NYSDEC") to operate the NPDES program within New York, and NYSDEC also administers its own water pollution control law within the state. See, e.g., New York Environmental Conservation Law ("NYECL") § 17-0801, practice commentaries; NYECL § 17-0303. NYSDEC's program includes administration of a discharge permit for the

15

City of New York's polluted water transfers into the Esopus Creek. Because EPA is not

regulating water transfers as part of the NPDES program, New York has borne (and will continue

to bear) the administrative burden of developing that permit's technology-based requirements –

requirements EPA is supposed to develop as part of the NPDES program.

43.    To the extent out-of-state pollutant transfers, unregulated by a NPDES permit,

contribute to the violation of water quality standards within a Plaintiff State, the Rule contributes

to the administrative burden which that state must bear under the Act in having to develop,

administer, and enforce TMDLs to remedy such problems. 33 U.S.C. § 1313(d), (e).

44.    The Water Transfers Rule also harms Plaintiff States' economic interests. "[T]he

primary purpose of the effluent limitations and guidelines was to provide uniformity among

federal and state jurisdictions enforcing the NPDES program and prevent the 'Tragedy of the

Commons' that might result if jurisdictions can compete for industry and development by

providing more liberal limitations than neighboring states." Natural Res. Def. Council v. Costle,

568 F.2d 1369, 1378 (D.C. Cir. 1977). By exempting discharges of pollutants in water transfers

from NPDES permitting and thereby foregoing uniform national pollution standards for them, the

Rule deprives Plaintiff States of the benefit of those standards. The Rule forces Plaintiff States

to either develop and enforce effluent limitations under their own state permit programs and

thereby place themselves at an economic disadvantage compared to states that fail to do so, or

simply to allow the contamination of their waters.

45.    The economic disadvantage to Plaintiffs is exacerbated when they must

supplement the effluent limitations they impose on in-state water transfer dischargers with

additional restrictions (such as TMDLs) applicable to pollutant dischargers within the state to remedy water quality problems caused, at least in part, by out-of-state water transfers unregulated by NPDES permits.

## FIRST CLAIM FOR RELIEF

### Violation of the APA, 5 U.S.C. § 701-706; Clean Water Act, 33 U.S.C. §§ 1311, 1342

46.    Plaintiffs governmental entities reallege the allegations set forth in all preceding paragraphs and incorporate them herein by reference.

47.    In exempting discharges of pollutants into navigable waters from the NPDES permitting requirements, EPA's promulgation of the Water Transfers Rule was inconsistent with, and exceeded the Agency's jurisdiction, authority, and limitations under the Clean Water Act. Because various federal courts, including the Second Circuit in the Catskill case and the United States District Court for the Southern District of Florida in the Friends of the Everglades case, have previously ruled that such exemption was contrary to the plain and unambiguous provisions of the Clean Water Act, the Rule exceeded EPA's power and authority.  See National Cable and Telecommunications Assn. v. Brand X Internet Services, 545 U.S. 967, 982 (2005).

48.    EPA's unlawful promulgation of the Rule is subject to judicial review under Section 706(2) of the Administrative Procedure Act.

49.    The APA, 5 U.S.C. § 703, and the Declaratory Judgment Act, 28 U.S.C. § 2201(a), entitle Plaintiff governmental entities to a declaration that EPA has violated the law,

and the APA, 5 U.S.C. §§ 702 and 703, authorizes the award of injunctive relief for such violations.

## SECOND CLAIM FOR RELIEF

### Violation of the APA, 5 U.S.C. § 701-706;
### Clean Water Act, 33 U.S.C. §§ 1311, 1342

50.     Plaintiffs reallege the allegations set forth in all preceding paragraphs and incorporate them herein by reference.

51.     The Water Transfers Rule is arbitrary, capricious, an abuse of discretion and not in accordance with either the plain statutory language or any reasonable interpretation of the Clean Water Act.

52.     EPA's unlawful promulgation of the Rule is subject to judicial review under Section 706(2) of the Administrative Procedure Act.

53.     The APA, 5 U.S.C. § 703, and the Declaratory Judgment Act, 28 U.S.C. § 2201(a), entitle Plaintiffs to a declaration that EPA has violated the law, and the APA, 5 U.S.C. §§ 702 and 703, authorizes the award of injunctive relief for such violations.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that the Court issue a judgment and order:

a)     declaring that the Water Transfers Rule, 40 C.F.R. § 122.3(i), is unlawful and is set aside because, in promulgating the Rule, EPA lacked the power and authority to overturn prior court decisions and acted in a manner inconsistent with, and in excess of, its statutory authority under the Clean Water Act;

18

b)       declaring that EPA's promulgation of 40 C.F.R. § 122.3(i) was arbitrary, capricious, an abuse of discretion and not in accordance with law;

c)       declaring that "water transfers," as defined in 40 C.F.R. § 122.3(i), are not exempt from NPDES permitting requirements;

d)       enjoining EPA immediately to repeal 40 C.F.R. § 122.3(i) and effect its depublication in the Code of Federal Regulations;

e)       staying application of the Rule until a final judgment in this action is issued by the Court;

f)       awarding Plaintiffs their reasonable fees, costs, expenses, and disbursements, including attorneys' fees, associated with this litigation under the Equal Access to Justice Act, 28 U.S.C. § 2412(d); and

g)       awarding Plaintiffs such additional and further relief as the Court may deem just, proper, and necessary.

Dated:   September 29, 2008
         Albany, New York

19

ANDREW M. CUOMO
Attorney General of the State of New York
Attorney for Plaintiff State of New York

By:    _Philip M. Bein_

Philip M. Bein (PB1742)
Kevin P. Donovan (applying for admission
     pro hac vice)
Katherine Kennedy
Assistant Attorneys General
New York State Department of Law
Environmental Protection Bureau
The Capitol
Albany, New York 12224
Tel:  (518) 474-4843
Fax: (518) 473-2534
E-mail: philip.bein@oag.state.ny.us
            kevin.donovan@oag.state.ny.us


RICHARD BLUMENTHAL
Attorney General of the State of Connecticut
Attorney for Plaintiff State of Connecticut

Kimberly P. Massicotte
Assistant Attorney General

By:    _David Wrinn_    | by PMB

David Wrinn (DW4689)
Assistant Attorney General
Connecticut Attorney General's Office
PO. Box 120, Hartford, CT 06141-0120
Tel:  860-808-5250
Fax:  860-808-5386
Email: david.wrinn@po.state.ct.us

21

JOSEPH R. BIDEN, III
Attorney General of the State of Delaware
Attorney for Plaintiff State of Delaware

By:    David L. Ormond, Jr.    /by PMB

David L. Ormond, Jr. (applying for admission pro hac vice)

Deputy Attorney General

Civil Division

820 North French Street, 6th Floor

Wilmington, Delaware 19801

Tel: (302) 577-8400

Fax: (302) 577-5866

E-mail: david.ormond@state.de.us


LISA MADIGAN
Attorney General of the State of Illinois
Attorney for Plaintiff State of Illinois

By:    Gerald T. Karr    /by PMB

Gerald T. Karr (applying for admission pro hac vice)

Matthew J. Dunn

Susan Hedman

Senior Assistant Attorneys General

Environmental Enforcement/Asbestos
   Litigation Division

Illinois Attorney General's Office

69 West Washington Street, 18th Floor

Chicago, IL 60602

Tel: 312- 814- 3369

Fax: 312- 814- 2347

E-mail: gkarr@atg.state.il.us
         mdunn@atg.state.il.us
         shedman@atg.state.il.us

G. STEVEN ROWE
Attorney General of the State of Maine
Attorney for Plaintiff State of Maine

By:   _Thomas A. Harnett_   l by PMB
      Thomas A. Harnett (TH0756)
      Assistant Attorney General
      Maine Office of the Attorney General
      6 State House Station
      Augusta, ME  04333-0006
      Tel:  (207) 626-8897
      Fax: (207) 287-3120
      E-Mail: thomas.harnett@maine.gov
              Jan.mcclintock@maine.gov


MICHAEL A. COX
Attorney General of the State of Michigan
Attorney for Plaintiff State of Michigan

By:   _S. Peter Manning_   l by PMB
      S. Peter Manning (P 45719)
      Assistant Attorney General
      Environment, Natural Resources,
        and Agriculture Division
      6th Floor, Williams Building
      525 West Ottawa Street
      P.O. Box 30755
      Lansing, MI  48909
      Tel:  (517) 373-7540
      Fax:  (517) 373-1610
      E-mail:  ManningP@michigan.gov


LORI SWANSON
Attorney General of the State of Minnesota
Attorney for Plaintiff State of Minnesota

      _Carla Heyl_   l by PMB
      Carla Heyl (applying for admission pro hac
      vice)
      Assistant Attorney General
      445 Minnesota Street, Suite 900
      St. Paul, Minnesota 55101-2127

23

Tel: (651) 296-7341
Fax: (651) 297-4139
E-mail: Carla.heyl@state.mn.us


JEREMIAH W. (JAY) NIXON
Attorney General of the State of Missouri
Attorney for Plaintiff State of Missouri

By: _Todd Iveson_____ | by PMB

 Todd Iveson (HI2298)
 Assistant Attorney General
 William J. Bryan
 Deputy Chief of Staff
 Joseph P. Bindbeutel
 Senior Counsel
 8th Floor, Broadway Building
 P.O. Box 899
 Jefferson City, MO 65102-0899
 Tel: (573) 751-3640
 Fax: (573) 751-8796
 E-mail: todd.iveson@ago.mo.gov
         Joe.Bindbeutel@ago.mo.gov
         Bill.Bryan@ago.mo.gov


ROBERT M. MCKENNA
Attorney General of the State of
Washington
Attorney for Plaintiff State of Washington

By: _Ronald L. Lavigne_ | by PMB

 Ronald L. Lavigne
 Senior Counsel
 (applying for admission pro hac vice)
 Ecology Division
 2425 Bristol Court SW, 2nd Floor
 Olympia, WA 98502
 Tel: (360) 586-6751
 Fax: (360) 586-6760
 E-mail: ronaldl@atg.wa.gov
         Ecyolyef@atg.wa.gov


24

GARVEY SCHUBERT BARER
Attorneys for Plaintiff
Government of the Province of
Manitoba, Canada

By:    _Eldon V.C. Greenberg_ / by PMB
       Eldon V. C. Greenberg (EG0619)
       Richard A. Wegman
       1000 Potomac Street, N.W.
       Suite 500
       Washington, D.C. 20007
       Tel:  (202) 965-7880
       Fax:  (202) 965-1729
       E-mail: dwegman@gsblaw.com
               egreenberg@gsblaw.com

25